IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION



United States District Court
Southern District of Texas
ENTERED

OCT 2 3 2014

David J. Bradley, Clerk of Court

| | | |
|---|---|---|
| BENJAMIN TALIANCICH AND | § | |
| MARIO ALBERTO GARCIA, JR., | § | |
| *Plaintiffs,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. B-12-CV-111 |
| | § | |
| OMAR LUCIO AND | § | |
| GILBERTO CISNEROS, JR., | § | |
| *Defendants.* | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is a Motion for Summary Judgment filed by Defendants Omar Lucio ("Lucio") and Gilberto Cisneros, Jr. ("Cisneros"), [Doc. Nos. 29, 73, 74], and a response by Plaintiffs Benjamin Taliancich ("Taliancich") and Mario Alberto Garcia, Jr. ("Garcia") (collectively "Plaintiffs"), [Doc. Nos. 29, 75]. Having carefully considered the Motion and the Response, as well as the summary judgment record, the Court grants summary judgment on Plaintiffs' federal claim against Defendant Cisneros and remands back to state court the remaining pendent state law claim against Defendant Lucio.

### I. FACTUAL BACKGROUND

Plaintiffs—two former detention officers at the Carrizales Rucker Detention Center in Olmito, Cameron County, Texas—bring this civil rights lawsuit against Cameron County Sheriff Lucio and the Sheriff's investigator, Cisneros, pursuant to 42 U.S.C. § 1983 and the laws of the state of Texas. The underlying facts forming the basis for Plaintiffs' claims are as follows.[1] On April 27, 2011, Officers Taliancich and Garcia were called to serve as backups for another

---

[1] The recited facts are not findings by this Court, but are merely gleaned from the summary judgment evidence produced by the Parties—including the Sheriff's Department investigation files provided by both sides. The Court takes all facts alleged in the light most favorable to Plaintiffs, as the nonmovants on summary judgment.

detention officer, Pedro Gomez ("Gomez"). Gomez was on his way to the "Bravo 6" section of the jail to speak to an inmate, Andres Noyola ("Noyola"), about certain comments he had made over the jail intercom that Gomez found to be disrespectful. When the three officers arrived at Bravo 6, Taliancich and Garcia "racked up" the inmates in the general population area and all three officers then proceeded down the hallway to Noyola's single cell.[2] The Bravo 6 pod officer opened the door to Noyola's cell, and Gomez entered the cell while Taliancich and Garcia remained at the entrance to the cell. Noyola was seated in a chair facing the wall with his back to the cell's entrance. According to Taliancich, Gomez twice advised Noyola to sit on his bunk, however, Noyola refused to comply with either request. [*See* Doc. No. 29, Ex. C ("Inmate Incident Report")]. Gomez then grabbed Noyola (by the shoulder according to Taliancich, by the arm and uniform according to Garcia, and by the neck according to Noyola) and physically moved him to his bunk. At this point, Gomez sat on top of Noyola, who he had physically forced to lie face down on his bunk, and struck him. The number and manner of blows is contested: Taliancich and Garcia reported two or three open-handed strikes to the back of Noyola's head, while Noyola told investigators and nurses that Gomez struck him with both open and closed fists—six times in the back of the head and one closed-fist punch to the right side of his face. A report taken at the infirmary states that Noyola had "slight bruising" with "minimal swelling . . . to [the] right side of [his] check," and that Noyola arrived complaining of bumps and bruises on the back of his head. [Doc. No. 29, Ex. C at 124].

Plaintiffs allege that throughout the assault, they told Gomez multiple times to leave Noyola alone, to relax, and to just forget about it. Taliancich reported that Noyola was cussing at Gomez while Gomez was still holding him down, and that Gomez warned Noyola in so many words that

---

[2]     Taliancich defined "racked up" in his incident report as "put[ting] [the inmates] in their assigned cells and clos[ing] their cell doors." [Doc. No. 29, Ex. C at 118]. In his report, Garcia defined "racked up" as "secur[ing] all the doors so [they] could open up [Noyola's] single cell . . . ." [*Id.* at 122].

he needed to learn how to appropriately speak to the officers. Taliancich also stated, however, that Noyola had "not verbally nor [sic] physically provoke[d] or threaten[ed]" any of the officers "prior to being assaulted by . . . Gomez." [*Id.* at 119]. According to Plaintiffs, they stood "frozen in shock" at the scene unfolding before them. [*Id.*]. They maintain that they were without training on how to respond to an assault perpetuated by another officer on an inmate and further maintain that, in any event, the assault was over in a matter of seconds, before Taliancich or Garcia had time to physically intervene and stop the assault. [*See, e.g.*, *id.* (statement by Taliancich during the investigation); *see also* Doc. No. 65 at 2, Plaintiffs' Complaint (alleging that Gomez's physical blows to Noyola were "very quick" and that "the whole assault was over within a matter of seconds, before Taliancich or Garcia could or needed to physically stop Gomez.")]. Taliancich later stated that he thought "it was wrong" what Gomez did to Noyola "by grabbing him and hitting him." [Doc. No. 29, Ex. C at 119]. Neither Taliancich nor Garcia reported the incident.

Two days later, on April 29, 2011, Noyola complained to jail management personnel, a deputy sheriff was dispatched to the hospital where Noyola was taken for examination, and an investigation began on the assault. Noyola, Taliancich, and Garcia were questioned multiple times by various jail personnel, investigators, and sergeants and, while their stories were similar in many respects, they differed in a few ways. For instance, unlike Taliancich's version of events, Noyola told investigating officers that he was facing the wall of his cell reading his Bible when Gomez walked up from behind, grabbed and threw to the ground the pen in Noyola's hand, and threw him by the neck onto his bunk. [*Id.* at 108]. Noyola claimed to be struck six times in the head and once in the face, versus the two slaps to the back of the head Taliancich reported and the two to three strikes reported by Garcia. Further, unlike Taliancich's and Garcia's

accounts, Noyola claimed that he heard the other officers (who he later identified as Plaintiffs) telling *Noyola* to remain calm. Taliancich and Garcia both stated that they repeatedly advised *Gomez* to calm down, and no mention was made of whether or not they directed any comment at Noyola. Noyola, Taliancich, and Garcia all agreed that the latter two were standing at the entrance of the cell during the assault and did not step in to intervene.

The Plaintiffs allege—both in their pleadings before this Court and in their written statements during the investigation—that they were unaware of Gomez's intention to assault Noyola when they responded to his request for backup. Garcia told investigators that he had provided backup for Gomez on previous occasions when Gomez was going to visit an inmate's cell to "control" the inmate, but that Gomez had never gotten physical with the inmates during any of those instances. Both Plaintiffs told investigators that they were unaware of any requirement to report the assault.

On May 3, 2011, after Gomez, Taliancich, and Garcia had been identified by Noyola as the officers involved in his assault and after each had been given letters of termination, Cisneros interviewed and obtained written statements from Noyola and a neighboring inmate to whom Noyola had related the assault details on the day in question.[3] Cisneros personally conducted interviews with the two inmates, but not with Taliancich or Garcia. According to the

---

[3]     It is unclear when exactly Cisneros first began personally participating in the investigation. Cisneros compiled a Criminal Case Report on the incident, which he signed on May 31, 2011. [*See* Doc. No. 29, Ex. C]. According to the "Narrative" on the second page of the Report, Cisneros first began interviewing individuals in connection with the assault on May 3, 2011, which was four days after the investigation began and after other officers had interviewed Taliancich, Noyola, and Garcia. [*Id.* at 2]. The Report, as attached to Defendants' Motion, consists of 124 pages of Cameron County Sheriff's Department Jail Division records related to the incident with Noyola. (Plaintiffs also produced portions of the Report. [*See* Doc. No. 18]). It contains, among other things, sworn statements by Noyola, Taliancich, and Garcia from interviews with various investigating officers; case reports on the incident; records from Noyola's medical examination; suspect and witness reports; arrest reports; information sheets; inmate incident reports; and the complaints and probable cause affidavits.

The Report, as provided to the Court, does not contain statements by Gomez or evidence from any investigation of him personally, other than arrest reports, information sheets from the Sheriff's Department identifying him, and the affidavit and complaint against him (which are the same as the ones against Plaintiffs with the exception of the added offense with which Gomez was charged).

information provided by the other inmate, upon inquiring as to Noyola's visible injuries, Noyola told him that earlier in the day he had been grabbed from behind and put in a chokehold by a jailer, who proceeded to hit him while two other jailers held him down to prevent him from fighting back. [*See* Doc. No. 29, Ex. C at 78]. Noyola never reported the latter statement—that other officers held him down while Gomez assaulted him—to investigating officers, but Noyola did tell officers that he wished to file charges against "the jailer who hit me and for [sic] the jailers who were helping him," who he eventually identified as Taliancich and Garcia. [*Id.* at 108]. In a supplemental written statement from Cisneros' interview with Noyola, Noyola explained that Plaintiffs were "standing by the door at the time of the assault," and that "the only reason [Noyola] [i]dentified" them, was that after Gomez stopped assaulting him, Taliancich told him to calm down and "what could I do" after being assaulted by Gomez.[4] [*Id.* at 110]. Noyola confirmed with Cisneros his desire to file charges against Taliancich and Garcia because, although Gomez was the assaulter, "the two other guards did not stop him." [*Id.*]

On May 4, 2011, Cisneros filed complaints with affidavits to obtain arrest warrants for Gomez, Taliancich, and Garcia for two Class A misdemeanors, Official Oppression and Abuse of Official Capacity (Gomez was additionally charged with Class A misdemeanor Assault). [*See* Doc. No. 29, Exs. A & C; Doc. No. 75-1]. Before submitting the warrant application, Cisneros received approval from his supervisor, Sergeant Alvaro Guerra (who supervised and was personally involved in the investigation of the assault, and who read, signed, and notarized the

---

[4]     It is not entirely clear from Noyola's written statement what Taliancich intended or meant (or what Noyola interpreted Taliancich to mean) by his comment (or query) "what could I do." Noyola's full statement provided in his interview with Cisneros, with the original punctuation, reads as follows:

> I want to state the only reason, I identified the two guards that were standing by the door was after Gomez stopped assaulting me and got off my back. The #2 Benjamin William Taliancich was the one *who told me to calm down.* "What could I do" after getting assaulted by Officer Gomez.

[Doc. No. 29, Ex. C at 110].

affidavits for the arrests), and Assistant District Attorney Rene Garza (who Cisneros testified also reviewed the application). [*See id.*; Doc. No. 74-1 at 12, 17]. The magistrate issued the warrants and on the following day Taliancich, Gomez, and Garcia were placed under arrest. Subsequently, Sheriff Lucio held a press conference concerning the incident, which was attended by multiple media outlets who reported on the charges against Gomez, Taliancich, and Garcia. On August 1, 2011, the charges against Plaintiffs were dismissed by Assistant District Attorney Julie Allen for insufficient evidence. [Doc. Nos. 18-12—18-5].

## II.  PROCEDURAL SUMMARY

Plaintiffs filed suit in state court against Lucio and Cisneros in their individual capacities on May 3, 2012. Plaintiffs sued Lucio under state law for defamation and Cisneros pursuant to 42 U.S.C. § 1983. The case was properly removed to this Court on the basis of federal question jurisdiction under 28 U.S.C. § 1331 for the Section 1983 claim, and supplemental jurisdiction under 28 U.S.C. § 1367 for the state law defamation claim. On October 2, 2012, Plaintiffs filed a First Amended Complaint suing Lucio in both his individual and official capacities, and Cisneros in his individual capacity only. [*See* Doc. No. 12]. Defendants timely moved to dismiss Plaintiffs' First Amended Complaint, alleging, *inter alia*, sovereign, qualified, and/or official immunity under federal and state law. [*See* Doc. No. 13].

After several extensions of the time for filing dispositive motions, Defendants moved for summary judgment on September 13, 2013. [Doc. No. 29]. In light of Defendants filing a Motion for Summary Judgment, which raised the same issues as those raised in their Motion to Dismiss, this Court denied without prejudice the Motion to Dismiss. [*See* Doc. No. 30]. Subsequently, Plaintiffs filed a Second Amended Complaint (the live complaint) (hereinafter the "Complaint"), suing Defendants in their individual capacities only (thus removing their claims

against Lucio in his official capacity). [Doc. No. 65]. According to Count One of Plaintiffs' Complaint, Sheriff Lucio defamed Taliancich and Garcia in communications with the media during the press conference described above by wrongly accusing them of committing crimes in relation to the assault on the inmate. In Count Two, Plaintiffs sue Cisneros under § 1983 for allegedly violating their rights under the Fourth Amendment to be free from unreasonable seizures. After a status conference with the Court and two additional deadline-extensions, the Parties filed supplemental briefings on Defendants' Motion for Summary Judgment, which are currently before this Court. [Doc. Nos. 73, 74, 75].

Specifically, Cisneros asserts summary judgment is proper on Plaintiffs' § 1983 claim against him for two reasons: (1) there is no evidence of a constitutional violation for which he can be liable under § 1983, and (2) he is entitled to qualified immunity. For the reasons discussed below, the Court agrees and finds that Cisneros is qualifiedly immune from Plaintiffs' federal law claim against him.

### III.   APPLICABLE LAW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant makes a properly supported motion, the burden shifts to the non-movant to show that summary judgment should not be granted. *Celotex*, 477 U.S. at 321–25. The nonmoving party must go beyond the pleadings and provide specific facts showing that there is a genuine issue for trial. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986).  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Here, in addition to moving for summary judgment on the merits of the Plaintiffs' constitutional claim, Defendant alleges that he is entitled to qualified immunity.  The typical summary judgment burden of proof is altered in a case involving a qualified immunity defense. *Michalik v. Hermann*, 422 F.3d 252, 262 (5th Cir. 2005) (citing *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 489 (5th Cir. 2001)).  When an officer alleges that he is entitled to qualified immunity, "he need only plead his good faith" and establish that he was acting within the scope of his discretionary authority, "which then shifts the burden to the plaintiff, who must rebut the defense by establishing that the officer's allegedly wrongful conduct violated clearly established law." *Id.*; *see also Pierce v. Smith*, 117 F.3d 866, 872 (5th Cir. 1997) ("We do not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs.").  "The plaintiff bears the burden of negating the defense and cannot rest on conclusory allegations and assertions but must demonstrate genuine issues of material fact regarding the reasonableness of the officer's conduct." *Michalik*, 422 F.3d at 262.

## IV.  DISCUSSION

Defendant Cisneros first argues that summary judgment should be granted on Plaintiffs' § 1983 claim against him because the evidence establishes as a matter of law that Cisneros had probable cause in seeking warrants for Plaintiffs' arrests, which is a complete defense to an unlawful arrest claim.  Thus, it is Defendant's contention that Plaintiffs cannot make out a violation of any constitutional right in order to hold him liable under § 1983.  Cisneros alternatively argues that even if Plaintiffs raised a genuine issue of material fact as to whether

probable cause existed, the Court should grant summary judgment in his favor because he is qualifiedly immune from suit.

Under the doctrine of qualified immunity, even if this Court were to find the evidence sufficient for a reasonable jury to find that Cisneros lacked probable cause in seeking Plaintiffs' arrest (and thus that a constitutional violation occurred), if Cisneros' conduct was nonetheless objectively reasonable, he is immune from suit. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002) ("Despite their participation in this constitutionally impermissible conduct, respondents may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Qualified immunity aims to protect government officials performing discretionary functions from civil damages liability if their actions were objectively reasonable in light of then-clearly established law. *Anderson v. Creighton*, 483 U.S. 635, 638 (1987); *Glenn v. City of Tyler*, 242 F.3d 307, 312–13 (5th Cir. 2001). The burden facing an opponent to qualified immunity is considerable, and the well-founded policies behind the doctrine have been cited time and again in this Circuit and need not be reiterated here.[5] *See Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001) ("A plaintiff must clear a significant hurdle to defeat qualified immunity."). As the Supreme Court stated in *Malley v. Briggs*, the qualified immunity standard gives officers flexibility for mistaken judgments by protecting "all by the plainly incompetent or those who knowingly violate the law." 475 U.S. 335, 341 (1986) ("Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.").

---

[5] *See, e.g., Sanchez v. Swyden*, 139 F.3d 464, 467-68 (5th Cir. 1998); *Byers v. City of Eunice*, 157 Fed. App'x 680, 682 (5th Cir. 2005); *Hare v. City of Corinth, Miss.*, 135 F.3d 320, 325 (5th Cir. 1998).

In determining whether a defendant is entitled to qualified immunity on summary judgment, the Court undergoes a two-step analysis. First, the Court must determine "whether (1) Plaintiffs allege a constitutional violation; (2) the law regarding the alleged violation was clearly established at the time of the operative events; and (3) the record shows that the violation occurred, or at least gives rise to a genuine issue of material fact as to whether the defendant actually engaged in conduct that violated the clearly-established law." *Kerr v. Lyford*, 171 F.3d 330, 339 (5th Cir. 1999), *abrogated on other grounds by Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003); *see also Brown*, 243 F.3d at 189. On summary judgment then, the threshold question is whether all the uncontested facts and any contested facts looked at in Plaintiffs' favor raise a factual issue as to a constitutional violation.

Second, an official may successfully assert the defense of qualified immunity, even if the plaintiff's civil rights have been violated, provided the official's conduct was objectively reasonable. *Sanchez v. Swyden*, 139 F.3d 464, 467 (5th Cir. 1998). The objective reasonableness of an official's actions is to be determined by the court as a matter of law. *Mangieri v. Clifton*, 29 F.3d 1012, 1016 (5th Cir. 1994). Again, this standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley*, 475 U.S. at 341) (internal quotations omitted). In addition to the qualified immunity analysis, a claim for false arrest or unreasonable seizure in violation of a plaintiff's constitutional rights requires a showing that there was no probable cause for the plaintiff's arrest. *Brown*, 243 F.3d at 189; *see also Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000) (holding that officials are entitled to qualified immunity against a charge of unlawful arrest where a reasonable official would believe probable cause was present).

### a. Violation of a Clearly Established Constitutional Right

To recover under Section 1983, Plaintiffs must establish that a state actor engaged in conduct that deprived them of "rights, privileges, or immunities" secured by the Constitution or laws of the United States. 42 U.S.C. § 1983. The deprivation must be caused by the conduct of a person acting under color of state law. Plaintiffs allege that Cisneros violated their Fourth Amendment rights to be free from unreasonable seizure by submitting a misleading warrant application to the magistrate for Plaintiffs' arrest, without probable cause that Plaintiffs had committed either offense for which they were charged. Thus, Plaintiffs' claim against Cisneros is twofold: (1) Cisneros lacked probable cause; and (2) Cisneros submitted misleading warrant applications in the form of (i) facially deficient complaints, and (ii) affidavits that omitted allegedly pertinent exculpatory information, which tainted the magistrate's probable cause determination. The Parties do not dispute that Defendant acted under color of state law.

The right to be free from arrest without probable cause is a clearly established constitutional right. *Mangieri*, 29 F.3d at 1016; *Beck v. Ohio*, 379 U.S. 89, 91 (1964) (explaining that the constitutionality of an arrest depends upon "whether, at the moment the arrest was made, the officers had probable cause to make it"). There is no doubt that such right was clearly established in May 2011 when Plaintiffs were arrested.[6] The Court thus finds that Plaintiffs have alleged a constitutional violation of a right that was clearly established at the time that the alleged violation occurred. The Court does not find, however, the evidence sufficient to give rise to a genuine issue of material fact as to whether the Defendant actually engaged in conduct that violated the clearly-established law. In other words, as discussed below, the Court finds that

---

[6] Defendant's argument that the "break in the causal chain" doctrine was "clearly established" at the time of the arrests is a misapplication of this step in the qualified immunity analysis. The break in the causal chain doctrine is a defense to Plaintiffs' claims. The inquiry of whether a law was "clearly established" refers to the right of which Plaintiffs claim they were deprived, not Cisneros' defense.

Cisneros was reasonable in his belief that probable cause existed to arrest Plaintiffs and, thus, the Plaintiffs' allegations, if true, do not establish a constitutional violation.[7]

Probable cause exists when the "totality of the facts and circumstances within a police officer's knowledge at the moment of arrest are sufficient for a reasonable person to conclude that the suspect had committed or was committing an offense." *Deville v. Marcantel*, 567 F.3d 156, 164 (5th Cir. 2009) (quoting *Resendiz v. Miller*, 203 F.3d 902, 903 (5th Cir. 2000)); *see also Hunter*, 502 U.S. at 228 (explaining that probable cause exists if at the time of arrest, the facts and circumstances within the official's knowledge, and of which he had reasonably trustworthy information, were sufficient to warrant a prudent official to believe that the crime had been committed). The existence of probable cause is based on facts known *at the time of arrest* rather than in hindsight. The exact degree of certainty required to establish probable cause is difficult to quantify; it falls somewhere between "bare suspicion" and what would be needed to "justify conviction." *Brinegar v. United States*, 338 U.S. 160, 175 (1949). As always, the "touchstone of the Fourth Amendment is reasonableness." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991).

If probable cause for an arrest "even arguably" existed, immunity will not be lost. *Brown*, 243 F.3d at 190. Therefore, in order for this Court to find a constitutional violation occurred, there must not have been probable cause for Cisneros to arrest Taliancich and Garcia for Abuse of Official Capacity or Official Oppression. However, even if this Court finds Cisneros' probable cause conclusion erroneous, if he nonetheless acted reasonably, immunity must be recognized. *See Glenn*, 242 F.3d at 312 ("This means that even law enforcement officials who

---

[7]    The Court notes that even if it were to find a fact issue existed as to whether there was probable cause to believe that Plaintiffs were guilty of Abuse of Official Capacity and Official Oppression, it does not find that genuine issues of material fact exist regarding the objective reasonableness of Cisneros' conduct. The first step in the qualified immunity analysis in this case requires that the Court determine whether a *reasonable* official would have believed that the suspect committed the crime, i.e., whether there was probable cause for the arrest. The second step in the analysis similarly entails a determination of the objective reasonableness of the officer's conduct. As such, the Court will consider the two steps of the qualified immunity analysis together in order to answer the ultimate inquiry in this case: whether Cisneros was objectively reasonable in seeking warrants to arrest Plaintiffs.

reasonably but mistakenly commit a constitutional violation are entitled to immunity." (internal quotation marks and brackets omitted)).

The offense of Abuse of Official Capacity under Texas law requires that (1) a public servant, (2) with intent to obtain a benefit or with intent to harm or defraud another, (3) intentionally or knowingly, (4) violates a law relating to the public servant's office or employment. Tex. Penal Code § 39.02(a)(1) (West 2009). The offense of Official Oppression also requires an intentional *mens rea*. That offense under Texas law has the following elements: (1) a public servant, acting under color of his office or employment, (2) intentionally, (3) subjects another to mistreatment, (4) that he knows is unlawful. Tex. Penal Code § 39.03 (West 2013); *State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996) (laying out the elements for § 39.03 and holding that the indictment must allege defendant's knowledge that mistreatment is unlawful as an element of the offense; intentional mistreatment, by itself, is not criminal). The crux of Plaintiffs' allegations is that no reasonable person could have concluded that either Taliancich or Garcia, by their "mere presence at the scene" of the assault, could have "intentionally or knowingly" violated a law of their employment *with the intent to harm* the inmate. [*See* Doc. No. 75]. Plaintiffs further argue (specifically in regards to the Official Oppression charges) that no reasonable person could have believed that they *intentionally* mistreated the inmate, knowing it to be unlawful. Essentially, it is Plaintiffs' argument that failure to intervene is not legally tantamount to intentional mistreatment (and that it was unreasonable to conclude that their inaction was anything more than negligent). With this in mind, Plaintiffs raise two objections to the sufficiency of the warrant application: one to the complaints and one to the affidavits.[8] The Court will consider each argument in turn.

---

[8]     The warrant applications for Taliancich and Garcia are identical. Each charges the same offenses for the same conduct and are worded the exact same. The only difference is, obviously, the name of the accused.

13

### i. Facial Sufficiency Of The Complaints

According to Plaintiffs, the complaints charging the two offenses are facially deficient because facts are not included to meet the elements of the crimes, and the few facts that are included do not fit the elements. For the Official Oppression offense, Plaintiffs allege that the complaints fail to specify any complicity on their part in the assault, or any duty of a jailer to stop an assault on an inmate; thus, without a "criminal duty" to intervene, they allege that they were merely present at the scene of the crime, which is not enough to be guilty of an offense that requires an intentional act. [*See* Doc. No. 32 at 12]. As for the Abuse of Official Capacity offense, Plaintiffs allege that the complaints are also "per se inadequate" in that they fail to specify any law requiring them to physically pull another officer off of an inmate. [*Id.*].

The Fifth Circuit has held that even an officer who acts with malice in procuring a warrant will not be liable if the facts supporting the warrant are put before an impartial intermediary such as a magistrate. *See Smith v. Gonzalez*, 670 F.2d 522, 526 (5th Cir. 1982). The intermediary's impartial decision is said to "break the causal chain" and insulate the initiating party. *Id.* The fact that an impartial intermediary has issued a warrant is also relevant when determining whether the officer's conduct was objectively reasonable under the second step in the qualified immunity analysis. As the Supreme Court has recently noted, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner or, as we have sometimes put it, in 'objective good faith.'" *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1245 (2012) (quoting *United States v. Leon*, 468 U.S. 897, 922-23 (1984)). Nevertheless, the Court is cognizant of the fact, which Plaintiffs stress in their briefings, that a neutral magistrate's issuance of a warrant does not always end the inquiry if "it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Id.* (quoting

*Malley*, 475 U.S. at 341). "The 'shield of immunity' otherwise conferred by the warrant, will be lost . . . where the warrant was 'based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.*

The Court finds the magistrate's determination of probable cause, despite any alleged deficiencies on the face of the complaints, a clear break in the causal chain in this case. Plaintiffs' arguments as to the complaints focus on flaws in the *legal* theory behind their charges.[9] The Supreme Court has recognized that those who submit arrest warrant affidavits are not always trained in law. *See Illinois v. Gates*, 462 U.S. 213, 235-36 (1983). The *Gates* Court noted that "search and arrest warrants have long been issued by persons who are neither lawyers nor judges, and who certainly do not remain abreast of each judicial refinement of the nature of probable cause." *Id.* at 235. The Court specifically acknowledged the "haste" of criminal investigations, rejecting any requirement that officers include "elaborate specificity" in applications for warrants. *Id.* ("Technical requirements of elaborate specificity once exacted under common law pleading have no proper place in this area." (internal quotation marks omitted)). Further, "many warrants are—quite properly, . . .—issued on the basis of nontechnical, common-sense judgments of laymen applying a standard less demanding than those used in more formal legal proceedings." *Id.* at 235-36. Unlike an intentional omission or misstatement of facts in a warrant application, how to legally define an offense and determine what behavior may constitute the basis for charging it is a decision more properly before an

---

[9]     As discussed above, Plaintiffs argue that no reasonable official could have concluded that their failure to intervene subjected them to criminal charges because mere presence at the scene is not enough for an offense that requires an intentional act. According to Plaintiffs, "if a mere citizen witnessed an assault and did nothing, no one would think to charge him with a crime," and the result does not change simply because they were jailers. [*See* Doc. No. 75]. The Court notes two factual problems with this argument: (1) as jailers, Taliancich and Garcia are public employees charged with caring for inmates (and are not merely private citizens), and (2) reasonable individuals could conclude that Plaintiffs' conduct at the scene proved that they were not mere bystanders, notwithstanding their contentions to the contrary.

independent judicial intermediary, and, in fact, is precisely the role of the judicial officer who is presented with an application for a warrant.

Here, Cisneros obtained approval of not only his supervisor, but also an assistant district attorney, before submitting the warrant application to the magistrate for her approval. The Court finds that whether Plaintiffs' "failure to act" constitutes behavior chargeable by either offense under Texas law was a question more appropriately reserved for a lawyer or a judicial officer, which, in this case, Cisneros had two: the assistant district attorney and the magistrate. *See Smith*, 670 F.2d at 526 ("A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers-all of whom may be potential defendants in a section 1983 action-is entirely consistent with due process of law . . . . The independent decisions of these intermediaries broke the causal chain between Lane and any constitutional violation."). If any element of either offense was missing or evidence of any element was lacking on the face of the warrant application, the decision of the magistrate—whose primary role is to interpret the law and determine what behavior does and does not break it—breaks the causal chain and insulates Cisneros from liability.

Plaintiffs insist that the magistrate's issuance of the warrant does not break the causal chain because Cisneros, his supervisor, the assistant district attorney, and the magistrate were *all* incompetent in finding that Plaintiffs were "probably guilty" of committing the alleged crimes. According to Plaintiffs, all four individuals were "entirely unreasonable" under the principle laid out in *Messerschmidt* for believing that Plaintiffs' failure to intervene was legally sufficient evidence of intentional mistreatment. In support of their argument, Plaintiffs point to Cisneros' deposition testimony in which they claim he admitted that there was no evidence that either Taliancich or Garcia intended to harm or mistreat the inmate. After a careful reading of

Cisneros' testimony, however, it is clear that Cisneros considered Plaintiffs' failure to report the assault as persuasive evidence of their intent—something he mentioned multiple times throughout his deposition. The Court does not find it "entirely unreasonable" to believe that both Taliancich's and Garcia's failure to report the incident and their failure to intervene in the assault (or even attempt to intervene), combined with the other evidence as laid out in more detail below, was sufficient for Cisneros to conclude that Plaintiffs were "probably guilty" of committing the offenses.[10] In other words, this Court cannot conclude that it is "obvious that no reasonably competent officer" would have believed probable cause existed to arrest Plaintiffs and that a warrant should issue. *See Messerschmidt*, 132 S. Ct. at 1245 (quoting *Malley*, 475 U.S. at 341). Plaintiffs, as jailers, had a duty to intervene to prevent the illegal assault of an inmate and to report the use of illegal force against an inmate; instead, the undisputed evidence reveals that, after "racking up" all of the inmates in their cells and thus isolating Noyola in his cell, Plaintiffs stood by and watched the assault take place. They then remained silent as to its occurrence, despite their opinion that the actions taken against Noyola were wrong. In any event, even if the Court were to assume, *arguendo*, that Cisneros (*and* the magistrate) erred in concluding that probable cause existed to arrest Taliancich and Garcia, Cisneros nevertheless would be entitled to qualified immunity because his decision was reasonable. *See Hunter*, 502 U.S. at 228-29.

---

[10]    While Plaintiffs spend a great deal of time arguing that the complaints are facially, or "per se," inadequate, Plaintiffs do not point to any authority that prohibits the supplementation of a complaint with additional details provided by the accompanying affidavit in the warrant application. Texas law only requires that a complaint (1) state the name of the accused or give a reasonable description of him; (2) show that the accused has committed some offense against the laws of the State, either directly, or that the affiant has good reason to believe and does believe that the accused has committed such offense; (3) state the time and place of the commission of the offense; and (4) be signed by the affiant. *See* Tex. Code Crim. Proc. Ann. art. 15.05 (West 1966). It is well-established under Texas law that "an affidavit or complaint in support of an arrest warrant need not contain the same particularity required of an indictment. Nor is the information in such an affidavit required to match in quality or quantity the evidence necessary to obtain a conviction." *Janecka v. State*, 739 S.W.2d 813, 822-23 (Tex. Crim. App. 1987). Texas courts have explicitly expressed a preference for "utilization of the warrant process on the part of police officers. Accordingly, [courts] view arrest . . . warrant affidavits in a common sense, not a hypertechnical fashion." *Id.* at 823 (internal citations omitted).

### ii. Substantive Challenges To The Affidavits

Plaintiffs allege that even if a valid arrest warrant was issued on the basis of an application that set forth sufficient facts and circumstances to establish probable cause (and thus even if failure to act can be legally tantamount to intentional mistreatment), Cisneros nevertheless violated their Fourth Amendment rights by excluding relevant information from the affidavits that a magistrate would have wanted to know. According to Plaintiffs, Cisneros, with intentional or reckless disregard for the truth, omitted exculpatory evidence obtained from the investigation of Noyola's assault, which Cisneros had in his possession, and which would have eliminated probable cause from the warrant application. Therefore, as Plaintiffs would have it, such omission required the magistrate to make her probable cause determination on the basis of a tainted submission.

A plaintiff may succeed in a § 1983 action for false arrest made pursuant to a warrant if the plaintiff shows: (1) that the officer knowingly and deliberately, or with reckless disregard for the truth, made false statements or omissions that created a falsehood in applying for a warrant; and (2) that such statements or omissions are "material," or necessary, to the finding of probable cause. *Hale v. Fish*, 899 F.2d 390, 400 (5th Cir. 1990); *Wilson v. Russo*, 212 F.3d 781, 786-87 (3d Cir. 2000). To meet this burden, Plaintiffs must make a "strong preliminary showing" on summary judgment that Cisneros made a misstatement or omission "with the intent to mislead the magistrate." *United States v. Tomblin*, 46 F.3d 1369, 1377 (5th Cir. 1995) (quoting *United States v. Colkley*, 899 F.2d 297, 301 (4th Cir. 1990)). Negligent omissions will not undermine an affidavit. *United States v. Martin*, 615 F.2d 318, 329 (5th Cir. 1980). As the Fifth Circuit has recognized:

Doubtless it will often be difficult for an accused to prove that an omission was made intentionally or with reckless disregard rather than negligently unless he has somehow gained independent evidence that the affiant had acted from bad motive or recklessly in conducting his investigation and making the affidavit. Nevertheless, it follows from *Franks* that the accused bears the burden of showing by a preponderance of the evidence that the omission was more than a negligent act. It is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause, the fact of recklessness may be inferred from proof of the omission itself.

*Id.*

The "break in the causal chain" defense is inapplicable to claims of omissions in the affidavit because "any misdirection of the magistrate . . . by omission or commission perpetuates the taint of the original official behavior." *Hand v. Gary*, 838 F.2d 1420, 1427-28 (5th Cir. 1988) (explaining that the causal chain is only broken where the "malicious motive of the affiant officer does not lead them to withhold any relevant information from the magistrate").

Omissions from and misstatements in an affidavit differ significantly from each other in that every intentional falsehood makes an affidavit inaccurate, unlike every omission. Intentional omissions are not always an attempt to mislead the magistrate. *See Wilson*, 212 F.3d at 787 ("All storytelling involves an element of selectivity. We cannot demand that police officers relate the entire history of events leading up to a warrant application with every potentially evocative detail that would interest a novelist or gossip . . . ."). Accordingly, to determine whether or not information omitted from a warrant affidavit is "material" to the determination of probable cause, courts ordinarily insert the allegedly omitted facts into the affidavit and ask whether the

reconstructed affidavit would still support a finding of probable cause. *See, e.g.*, *Kohler v. Englade*, 470 F.3d 1104, 1113 (5th Cir. 2006) (citing *Martin*, 615 F.2d at 328). Plaintiffs allege that the following information was omitted from the affidavits and material to the probable cause determination:

1. The investigation made by Lucio and his staff revealed that Taliancich and Garcia were not conspirators or parties in any way to Gomez's assault on Noyola, but were merely present.

2. The investigation revealed that plaintiffs told investigators that they "did not know how to react to the situation (the assault)."

3. That Taliancich told the investigator that "it happened so fast, I didn't know what the heck to do," and plaintiff Garcia said the same.

4. The investigation revealed that during the assault, plaintiffs told Gomez to forget about it and let it go."

5. The investigation revealed that during the assault plaintiffs were standing by the entrance to Noyola's cell, telling Gomez to calm down, relax and leave, and thereafter Gomez complied and left.

6. Taliancich said he didn't do anything because he just "froze."

7. Taliancich said he was "shocked" at what was going on.

8. Garcia said he had never been in a situation like that before.

9. Neither plaintiff knew in advance that Gomez was going to strike Noyola.

10. Garcia said that the [sic] had provided backup for Gomez before when he wanted to speak with an inmate, but that Gomez only scolded the inmate.

11. The incident started when Noyola refused to comply with Gomez's repeated instruction to get off a chair and sit on his bunk.

12. Noyola was "pissed off" and yelling obscenities at Gomez.

13. Taliancich said he was afraid Noyola might attack him and Garcia if they pulled Gomez off Noyola.

14. Taliancich and Garcia had only been guards for a little over a year.

15. There is no training for guards on what to do when a guard is assaulting an inmate.

16. The jail has no rule, policy or manual which addresses or instructs a guard what to do when another guard is assaulting an inmate.

[Doc. No. 65 at 7-8].

Viewing the evidence in Plaintiffs' favor, even when the allegedly material omitted information is inserted into the affidavits, it does not change the probable cause determination. Cisneros testified that he based his probable cause determination on his own investigation of the assault, the inmate grievance form, the inmate incident reports made by officers participating in the investigation, the reports of both Taliancich and Garcia, and the "collective knowledge of Sheriff's Department personnel involved in the investigation, as well as [his] education, training, and experience." [*See* Doc. No. 29, Ex. A]. Cisneros' own, personal investigation of the assault entailed interviewing the inmate and his neighboring inmate, but not the Plaintiffs. He was nevertheless clearly entitled to rely upon the Sheriff Department's file, which included investigation conducted by other officers who interviewed Taliancich and Garcia. The Fifth Circuit has always held that the "arresting officer does not have to have personal knowledge of all the facts constituting probable cause; it can rest upon the collective knowledge of the police

when there is communication between them." *United States v. Walker*, 960 F.2d 409, 416 (5th Cir. 1992).

With that in mind, even with possession of the Plaintiffs' arguably exculpatory statements in the investigation file, a reasonable officer might have doubted the full veracity of their statements so as not to include *all* of them in the affidavits. For one, Plaintiffs only provided statements and reports on the incident once approached by investigators two days later, despite their duty to report the use of force on an inmate. Plaintiffs argue that no reasonable officer would have believed that they intended to mistreat Noyola because their statements in the investigation file indicated that they were shocked when Gomez began assaulting Noyola, were unaware that Gomez intended to assault Noyola when they offered to back him up, advised Gomez to stop and leave, and were scared to pull Gomez off of Noyola because they thought Noyola might attack them. Yet, Cisneros was also presented with the following: there were three guards versus one inmate (all other inmates having been "racked up"), who was already pinned down on his bunk and under the physical control of Gomez; the inmate claimed that Taliancich was telling *the inmate* to calm down; and the assault had to have lasted long enough for Gomez to strike Noyola between two and seven times (depending on which story one believes) and, if one believes Plaintiffs' statements, long enough for Plaintiffs to have requested that Gomez stop *multiple* times. Despite all of this, Plaintiffs made no attempts to interfere. Finally, and significantly, neither Plaintiff reported the incident.

Although Plaintiffs claim that they were unaware that Gomez intended to assault Noyola, Cisneros also had statements by Taliancich and Garcia that they knew they were backing up an officer who was walking over to confront an inmate who had been disrespecting the officer all day, and they knew the officer was upset about it. [*See, e.g.*, Doc. No. 29, Ex. C at 118

(Taliancich stated that Gomez told them Noyola had been disrespecting him all day and had told him to "rub it on your ass" in Spanish over the jail intercom.)]. From this, a reasonable official in Cisneros' position (and, for that matter, a reasonable jury) could have easily disbelieved Plaintiffs' excuse that they were too shocked to intervene. Once Gomez began striking the inmate—who the investigation (including statements by Plaintiffs themselves) revealed had been non-aggressive—a reasonable officer in Cisneros' position could have concluded that Taliancich and Garcia—who admitted that they considered Gomez's actions wrongful—should have intervened and realized their duty to do so.[11] The undisputed evidence shows that Gomez had Noyola face down on his bunk and was sitting on top of him. It was not unreasonable to conclude that Taliancich's and Garcia's claims that they did not want to interfere for fear they would be harmed were nothing more than excuses, and bad ones at that. In fact, it would be reasonable to believe that these excuses were made to cover up their complicity in Gomez's attack.

Further, all of the omitted information that Plaintiffs allege was material to the magistrate's probable cause determination comes from their own statements, provided to investigators two days after the assault and only after approached. Cisneros testified that he considered many of Plaintiffs' statements merely excuses for their inaction rather than objective facts, the latter of which is the only type of information he provides in an affidavit for an arrest warrant. [*See* Doc. No. 74-1, at 13]. In any event, Cisneros did in fact include in his affidavits what is probably the most exculpatory evidence uncovered from the investigation (and which Plaintiffs claim was omitted): "Detention Officer Taliancich stated he and Detention Officer Mario Alberto Garcia Jr.

---

[11]   *See* Doc. No 29, Ex. C at 119 (written statement by Taliancich during the investigation on the assault) ("I think it was wrong what Officer Gomez did to Inmate Noyola by grabbing him and hitting him. Inmate Noyola *did not verbally nor physically provoke or threaten* Officer Pedro Gomez, Officer Mario Garcia, or I at the time we were in his cell prior to being assaulted by Officer Pedro Gomez." (emphasis added)).

repeatedly told Detention Officer Pedro Gomez to stop what he was doing but he would not listen." [Doc. No. 29, Ex. C at 13].[12]

As for the remaining allegedly omitted information from the list detailed above, other evidence in the record on summary judgment shows that much of the information is incorrect and/or disputable, and certainly not material or even necessarily exculpatory. For instance, Defendant testified that basic police training teaches officers how to respond to another officer assaulting a person and that it is common sense for "anybody in uniform," including jailers, that they should intervene in a situation like the one faced by Plaintiffs. [Doc. No. 74-1 at 8]. It therefore could not have been in reckless disregard of the truth for Cisneros to omit the statement Plaintiffs claim now was wrongfully omitted that "there is no training for guards on what to do when a guard is assaulting an inmate." Cisneros clearly believed, and was reasonable in believing, that Plaintiffs knew they had a duty to act when excessive and/or illegal force is used against an inmate. Along the same lines, Cisneros was not wrong—and it was not unreasonable—to omit the statement, "the jail has no rule, policy or manual which addresses or instructs a guard what to do when another guard is assaulting an inmate." Both sides acknowledged during Cisneros' deposition that, at minimum, the jail has a rule requiring employees to stop any fighting that they witness. [*Id.*]. Finally, as for the first statement Plaintiffs claim Cisneros should have included—"the investigation made by Lucio and his staff revealed that Taliancich and Garcia were not conspirators or parties in any way to Gomez's assault on Noyola, but were merely present"—it is obviously a self-serving statement made only by Plaintiffs and based only upon Plaintiffs' word; it is not a fact to include in a warrant

---

[12]     Plaintiffs' allegation that Cisneros omitted from the affidavit Noyola's refusal to comply with Gomez's instruction to sit on his bunk is also unfounded: Cisneros explicitly explained in the affidavits that "Noyola kept his back towards Detention Officer Pedro Gomez ignoring him," when Gomez twice instructed Noyola to sit on his bunk. [*Id.* at 12].

application. It was not even a conclusion made by anyone conducting the investigation that Cisneros would have seen in the case file or could have relied on.

Plaintiffs further argue that Cisneros omitted from the warrant application which "law relating to [their] office or employment" they were allegedly breaking (an element of the charged offense of Abuse of Official Capacity). Cisneros testified in his deposition that he believed the Plaintiffs were violating a law of their employment by knowingly allowing Gomez to assault the inmate. Specifically, Cisneros testified that Plaintiffs were breaking the inmate's right to be free from cruel and unusual punishment under the Eighth Amendment, but that he did not necessarily have the Eighth Amendment *specifically* in mind at the time of their arrest. [*See* Doc. No. 74-1 at 12 ("Do I have a book reading the – no—that says, oh, the Eighth Amendment, this and this, and then I based myself on that? No."). Defendant responds by pointing to cases in which courts have acknowledged an officer's duty to intervene when another officer is assaulting an inmate. According to Defendant, detention officers, including Plaintiffs who were somewhat new and had just undergone training, are specifically taught this duty during their training. (Plaintiffs, on the other hand, insist that their inexperience should have indicated to Cisneros that they were more likely *not* to have known how to respond to an assault on an inmate by another officer and thus did not have criminal intent to mistreat him, a fact that should have been included in the affidavits.)

The Court, however, does not find Cisneros' failure to specify which law of their employment Plaintiffs allegedly broke material to the finding of probable cause. Common sense dictates that jailers—whose roles involve protecting inmates in their care—have some duty to interfere when another jailer illegally assaults a non-aggressive inmate, especially when their presence is either implicitly or explicitly aiding the assault. Plaintiffs fail to present any

evidence that jailers do *not* have a duty to intervene, and they admit that they had a duty to report the incident.[13] Plaintiffs further fail to present any authority that Cisneros was required to specify which law of their employment they allegedly broke, and they concede that the predicate law could have been Official Oppression. Texas law requires only that a charging instrument track the statutory language. *State v. Edmond*, 933 S.W.2d 120, 127 (Tex. Crim. App. 1996). Here, the complaints track the language of the penal code, including the requirement that the accused violate a law relating to his office or employment. [Doc. No. 29, Ex. C at 41].

Certainly, none of the information is "clearly critical" to a finding of probable cause so as to infer recklessness on the part of Cisneros, and Plaintiffs have failed to prove that any omission "went beyond mere negligence." In any event, the Court finds the evidence insufficient that any of the omitted information was material to the probable cause determination and therefore it need not consider whether Cisneros acted intentionally or recklessly.[14]

The Court finds that Cisneros did not act outside the scope of his authority or degree of reasonableness expected of an officer in his situation. The fact that Plaintiffs' charges were ultimately dismissed for lack of sufficient evidence cannot and does not enter the Court's analysis. Whether an officer had probable cause to arrest is viewed in light of the facts and circumstances at the time of arrest; it is not a hindsight evaluation. The Constitution does not guarantee that only the guilty will be arrested; "if it did, section 1983 would provide a cause of

---

[13]    Although Plaintiffs denied to investigators that they knew at the time of the incident the duty to report, they both acknowledged that such duty exists, stating that they would know for the future.

[14]    The Court notes that other courts have found defendant-officials immune when they omitted from an affidavit exculpatory information arguably immensely more relevant to the probable cause determination than Plaintiffs claim here. For instance, the Fifth Circuit has found officers immune when they mistakenly identified and arrested a man who they held for several days in jail, despite being in possession of arguably "conclusive proof" (in the form of the actual suspect's photographs, fingerprints, and information about the location of a specific tattoo) that he was not the actual suspect. *See Sanchez*, 139 F.3d at 468-69 (finding in favor of the defendants despite the exculpatory information in defendants' possession, stating that "we have required proof that the official's actions went beyond mere negligence before that tort takes on constitutional dimensions").

action for every defendant acquitted--indeed for every suspect released." *Smith*, 670 F.2d at 526 (citing *Baker v. McCollan*, 443 U.S. 137 (1979)); *Sanchez*, 139 F.3d at 468. Cisneros was not objectively unreasonable, in light of the totality of the circumstances facing him at the time he sought arrest warrants, in his belief that probable cause existed for Plaintiffs' arrests.

Upon careful consideration of the above facts, and after an exhaustive review of the summary judgment record in this case, the Court finds, as a matter of law, that a reasonable officer in Cisneros' position could believe probable cause existed to arrest Plaintiffs for Abuse of Official Capacity and Official Oppression. Even after drawing all available inferences in Plaintiffs' favor, the Court is compelled by the facts to so hold. Having found that a reasonable officer in Cisneros' position could believe probable cause existed, the Court finds that Plaintiffs have failed to create a factual issue as to the merits of their Fourth Amendment claim, and that Cisneros is entitled to qualified immunity.

## V.     ALLEGATIONS AGAINST LUCIO

As a consequence of granting summary judgment on—and disposing of—Plaintiffs' federal law claim, the Court has before it only the state law claim against Lucio remaining, which it concludes would be more appropriately handled in state court. This Court, therefore, will not address the facts, claims, or defenses pertaining to the defamation claim against Lucio.

## VI.     CONCLUSION

The Court finds that Plaintiffs have failed to produce sufficient evidence to create a genuine issue of material fact as to any violation of their constitutional rights by Defendant Cisneros. The Court further finds that Defendant Cisneros is entitled to qualified immunity on Plaintiffs' Section 1983 claim against him. The Court hereby grants Defendant Cisneros' motion for

summary judgment. Given that all that remains in this suit is Plaintiffs' state law defamation claim against Defendant Lucio, the Court remands that claim to state court.

Signed this 23rd day of October, 2014.

Andrew S. Hanen
United States District Judge